**In re POTVIN LUMBER COMPANY, INC., Debtor.**

**Bankruptcy No. 82–00199.**

United States Bankruptcy Court, D. Vermont.

Sept. 18, 1982.

Richard A. Lang, Jr., Burlington, Vt., for debtor.

Richard S. Smith and Frederick Harlow, Rutland, Vt., for Berkshire Bank and Trust Co.

Jerome I. Meyers, Springfield, Vt. by his Law Clerk, Ilerdon Mayer, for the Shawmut Nat. Bank.

## MEMORANDUM AND ORDER ON MOTION TO USE CASH COLLATERAL

CHARLES J. MARRO, Bankruptcy Judge.

The Motion of the Debtor to use cash collateral and the Objections of Berkshire Bank and Trust Company to the use of cash collateral and proceeds from the sale of inventory and from the collection of Accounts Receivable filed on September 7, and September 9, 1982, respectively, came on for hearing, after notice.

The Shawmut National Bank had no objection to the Motion of the Debtor.

Under § 363(c)(2) of the Bankruptcy Code a trustee may not use, sell, or lease cash collateral unless each entity that has an interest in such cash collateral consents; or the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section. The debtor in possession under Chapter 11 of the Bankruptcy Code has the same rights as a trustee in straight liquidation. See § 1107 of the Code.

■ The interest of a secured party in collateral is protected by § 363(e) of the Code which provides that at any time, on request of an entity that has an interest in property used, sold, or leased or proposed to be used, sold, or leased by the trustee the court shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest. In any hearing under this section the trustee has the burden of proof on the issue of adequate protection. In this case it is the Debtor in this Chapter 11 reorganization proceeding. The term "adequate protection" is intended to be a flexible one and while examples of adequate protection are given in § 361 (periodic cash payment, an additional replacement lien, or an indubitable equivalent of the entity's interest in the property). These examples are not intended to be limiting, and the circumstances of the case will dictate the necessary relief to be given. 2 Collier 15th Edition, 363–25, § 363.06.

■ In this case the Debtor is indebted to the Berkshire Bank, including principal and interest, in the total sum of $1,527,080.00 with a per diem of $436.00. The Bank as security for this indebtedness has a security interest in the inventory of both finished and raw lumber and all other personal property owned by the Debtor. The parties are not in agreement as to the valuation of the finished lumber. Some of it is located at the Stamford, Vermont logging mill site of the Debtor and the remainder is at the Brattleboro Kiln, Brattleboro, Vermont. The Debtor, through its president, Robert J. Potvin, testified that the fair market value of all of the lumber as of July 31, 1982 was about $583,000.00 with a valuation of $237,-000.00 placed on the lumber situated at the Brattleboro Kiln and $378,319.00 for that at the Stamford mill site. There is a discrepancy in these figures.

The Bank improved as a witness Irwin Elkins, who had had considerable experience in the lumber business dating back to 1946 and he testified that he had not examined the lumber at the Stamford mill site, but that he was the operator of the Brattleboro Kiln through his corporation and that, in view of the condition of this lumber, it had a fair market value of not more than $40,000.00. On the other hand, Craig A. Walton, who was also called as a witness by the Bank, expressed an opinion in a letter dated May 17, 1982 to David Richards of the Berkshire Bank and Trust Company that the lumber at the Stamford, Vermont mill site as of April 26, 1982 was worth $344,898.00 and that at Brattleboro, Vermont was valued at $238,868.00 for a total of $583,766.00. His appraisal was based on the Tenth Edition of Hardwood Market Report. Mr. Walton further expressed an opinion in this letter that Potvin Lumber Company, Inc., appeared to be a very clean and exceptionally efficient operation; that his estimates of footages were in agreement with footages shown on Potvin's inventory and the Brattleboro record showed only a

3,000 BF discrepancy. He also expressed an educated guess Potvin's then inventory might appreciate 8% or more by August 1, 1982 due to the lack of inventory throughout the industry.

Potvin testified that there had been some inventory sold since July 31, 1982, but that the current value of the finished lumber could be off approximately four percent.

After considering the testimony of these witnesses, the Court feels that the valuations placed upon the lumber by the Debtor are fairly accurate and that the fair market value of the finished lumber belonging to the Debtor is at least $550,000.00. In addition to the finished lumber, the Debtor has other inventory consisting of raw materials and he testified that the total valuation of this inventory was $809,303.00. He also testified that the Debtor has an escrow account in the Berkshire Bank of $5,225.00; motor vehicles valued at $379,200.00, although the Schedule attached shows an actual market value for these vehicles of $334,000.00; office equipment, furnishings, valued at $5,000.00; machinery, fixtures, equipment, and supplies with a valuation of $904,000.00; miscellaneous tools and items worth $25,000.00; a chose in action against Mr. and Mrs. Rinaldo Farinon for $140,-000.00; $6,000.00 cash value in an insurance policy; prepaid expenses and receivables totaling $141,011.00.

His testimony as to these valuations was undisputed. It therefore appears that the total value of all the personal property in which the Berkshire Bank has a security interest is $2,369,539.00. From this amount the estimated value of the chose in action against Farinon can be discounted. However, since the total indebtedness from the Debtor to the Berkshire Bank is $1,527,-080.00, it appears that the Bank has adequate protection. Further, Potvin testified that the Debtor would be willing to attach some rather severe conditions for the use of the cash collateral which the Court is incorporating in its Order and which will tend to give the Bank additional protection.

Now, therefore, upon further consideration of the testimony adduced at the hearing and the arguments of counsel,

IT IS ORDERED that the Debtor may use the cash collateral for a period not-to-exceed 60 days from the date of this Order upon the following conditions:

1. The Debtor shall, if requested in writing by the Berkshire Bank, retain a marketing consultant.

2. With a benchmark of July 31, 1982, the Debtor shall not impair the cash flow and shall not diminish the inventory.

3. The Debtor shall keep current all indebtedness for obligations incurred during the 60-day period in which he is using cash collateral.

4. The Debtor shall not sell any of the fixed assets without the consent of the Berkshire Bank and the approval of this Court after proper notice prescribed by the Bankruptcy Code.

5. The Debtor shall not increase the payroll and shall take all reasonable steps to decrease the costs of operation.

6. The president of the debtor, Robert J. Potvin, shall decrease his salary to a rate of $35,000.00 a year plus costs of the premium of a $500,000.00 insurance policy which he shall maintain as a protection to the bank of its secured indebtedness.

7. The Debtor shall not pay any tax obligations or any other indebtedness which pre-existed the filing of the Petition for Relief.

8. The Debtor shall furnish bi-weekly reports to the Berkshire Bank and to the Court as to its operations during the period that it is using cash collateral.